# Shedding Light on Copyright Trolls: An Analysis of Mass Copyright Litigation in the Age of Statutory Damages

## James DeBriyn[*]

Copyright law and the Internet are at an impasse. The looming question is how to approach unlicensed distribution of copyrighted works in the age of peer-to-peer networks. To supplement profits from copyrighted works, copyright holders have devised a mass-litigation model to monetize, rather than deter, infringement. Because of the existence of statutory damages, plaintiffs utilize the threat of outlandish damage awards to force alleged infringers into quick settlements.

Statutory damages incentivize litigation-based businesses and encourage copyright holders to waste judicial resources by litigating even when actual damages are nominal. This Article presents an analysis of the legal and policy issues that arise in a mass-litigation model primarily through filings in federal district courts. After a discussion of the original purposes of U.S. copyright law, this Article concludes that statutory damages should be removed from the 1976 Copyright Act.

I. INTRODUCTION ................................................................80
II. BACKGROUND ................................................................83
    A. The Copyright Act of 1976 ................................................83
    B. A Deterrence-Based Litigation Model: Early Litigation Strategies of the RIAA ................................................84
    C. A Profit-Based Litigation Model: The Rise of the Copyright Troll................................................86
        1. Sampling: The Opportunist Troll ................................86
        2. Online News: Individual Suits as a Business Model .....88
        3. File Sharing: Mass-Litigation as a Business Model.......90
III. A CLOSER LOOK AT MASS LITIGATION.........................................92

· J.D. Candidate, University of Wisconsin Law School, 2012; B.A.E.: Secondary Mathematics, Arizona State University, 2006. I would like to thank the editorial board of the UCLA Entertainment Law Review for its direction and editing throughout this Article's many drafts.

    A.  *Identifying Infringement* .......................................................92
    B.  *Cost Reduction Techniques for Litigation* ...........................95
    C.  *Unequal Bargaining Power* .................................................97
        1.  Settlement Letter ...........................................................98
        2.  The Possibility of Trial ...............................................100
IV. ADDRESSING THE MASS-LITIGATION BUSINESS MODEL ..............102
    A.  *Procedural Solutions Are Insufficient* ...............................103
    B.  *Can We Learn Anything from the Patent Troll Problem?* .104
    C.  *Removing the Incentive: Statutory Damages* ....................106
V.  CONCLUSION ................................................................................110

I.  INTRODUCTION

In May 2010, Voltage Pictures initiated a lawsuit against 5000 John Doe defendants for illegally distributing the Academy Award-winning movie *The Hurt Locker*.[1]  In April 2011, Voltage Pictures amended its original complaint bringing the total number of defendants to 24,595.[2] While a lawsuit against 24,595 individuals is alarming, by the end of 2011, more than 250,000 individuals had been sued for similar alleged acts.[3]  This trend becomes unfathomable when one considers that these lawsuits only involve a micro-fraction of the intellectual property being illegally traded on the Internet.[4]  This Article follows the ongoing saga of *The Hurt Locker* litigation to illuminate the issues that arise in mass litigation of copyright claims.

On June 26, 2009, *The Hurt Locker* was released in movie theaters in the United States.[5]  Despite winning six Academy Awards,[6] the film grossed only $16.4 million in the theatrical box office—a disappointing return against a $15 million production budget.[7]  Thousands of copy-

---

[1] Complaint at 1, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873, 2010 WL 4955131 (D.D.C. May 24, 2010), ECF No. 1.

[2] First Amended Complaint for Copyright Infringement at 1, Voltage Pictures, LLC v. Vasquez, No. 1:10-cv-00873 (D.D.C. Apr. 22, 2011), ECF No. 143-1.

[3] Ernesto, *Hurt Locker BitTorrent Lawsuit Dies, But Not Without Controversy*, TORRENTFREAK (Dec. 22, 2011), http://torrentfreak.com/hurt-locker-bittorrent-lawsuit-dies-but-not-without-controversy-111222/.

[4] The Recording Industry Association of America estimates that 30 billion songs were downloaded illegally between 2004 and 2009.  *For Students Doing Reports*, RIAA, http://www. riaa. com/faq.php (last visited Feb. 3, 2012).

[5] *The Hurt Locker*, IMDB, http://www.imdb.com/title/tt0887912/ (last visited Feb. 5, 2012).

[6] *Id.*

[7] Jared Moya, *"Hurt Locker" Producers to Sue "Tens of Thousands" of File-Sharers,*

2012]     SHEDDING LIGHT ON COPYRIGHT TROLLS          81

right infringing Internet downloads of the movie months before its official theatrical release were blamed in part for the poor profits.[8]  In response, the producers decided to sue individuals who downloaded the film.[9]  When the lawsuits were first announced, there were an estimated 50,000 defendants.[10]  There was also speculation that if the initial suits were successful, the total number of Does named for illegally sharing *The Hurt Locker* could reach 100,000.[11]

These types of lawsuits are not intended as a scare tactic to deter file sharing, but are used to encourage quick settlements.[12]  Without regard to the existence of any actual damages, Voltage Pictures will likely press a claim for statutory damages, which will carry up to a $150,000 award for willful violations.[13]  While these damages are beyond an average defendant's means, the purpose of each lawsuit is not to seek the full damages through a trial, but rather to pressure a defendant to settle claims for around $3000.[14]

---

ZEROPAID (May 12, 2010), http://www.zeropaid.com/news/89122/hurt-locker-producers-to-sue-tens-of-thousands-of-file-sharers/.  *The Hurt Locker* is the lowest grossing film ever to win the Oscar for Best Picture.  *Id.*

[8]  *See id.*  The film was leaked at least six months before the official release.  *Id.*

[9]  *Id.*  Peer-to-peer technologies work because the same users who download files are simultaneously uploading files to other users.  Because uploading does not have fair use protections, it is more likely that the individuals will be sued for uploading content rather than downloading.  *See infra* Part III.A.

[10]  Christopher Null, *50,000 Sued Over "Hurt Locker" Piracy*, YAHOO! NEWS (May 14, 2010, 4:11 PM), http://old.news.yahoo.com/s/ytech_wguy/20100514/tc_ytech_wguy/ytech_wguy_tc2074.

[11]  Mike Masnick, *And We're Off: Hurt Locker Files First 5,000 Lawsuits Against File Sharers*, TECHDIRT (May 28, 2010, 11:17 AM), http://www.techdirt.com/articles/20100528/1044069619.shtml.

[12]  Julie E. Cohen, *Pervasively Distributed Copyright Enforcement*, 95 GEO. L.J. 1, 17 (2006).  The recording industry experimented with a deterrence model that included requiring infringers to "'come clean' and pledge to change their ways."  *Id.* at 16.  This strategy was abandoned for a more profitable litigation based strategy.  *Id.* at 17.  In an effort to avoid "public backlash," plaintiffs seek quick settlements which avoid the courts and settlement agreements require defendants to maintain confidentiality.  *Id.*

[13]  Nate Anderson, *The RIAA? Amateurs. Here's How You Sue 14,000+ P2P Users*, ARS TECHNICA (June 2010), http://arstechnica.com/tech-policy/news/2010/06/the-riaa-amateurs-heres-how-you-sue-p2p-users.ars.  *See also infra* Part II.A.

[14]  Greg Sandoval, *'Hurt Locker' Lawyer: Illegal Sharing Must End (Q&A)*, CNET (Sept. 29, 2010), http://news.cnet.com/8301-31001_3-20018004-261.html (suggesting the settlement amount may be closer to $2900).  Plaintiffs are aware that defendants often lack the means to pay large judgments, so by using private settlement services, plaintiffs can assure low overhead as well as expect most defendants to accept the settlement terms.  Cohen, *supra* note 12.  Private settlement services are companies that collect payments made by defendants.  *See* COPYRIGHT SETTLEMENTS, http://www.copyrightsettlements.com/ (last visited Feb. 3, 2012).

Had Voltage Pictures only sued the 5000 Does named in the original complaint,[15] and 75 percent of the defendants could be identified,[16] were sued, and chose to settle[17] for $2900,[18] the litigation would generate $10.9 million.  Reports suggest that the plaintiffs will receive 30 percent[19] of the $10.9 million—$3.3 million.  This creates such strong incentives to litigate[20] that one may question whether an enforcement-based business model can be reconciled with the purposes of copyright law.

When the U.S. Supreme Court was called upon to illuminate the purposes of copyright, the Court found that the "purpose of copyright [law] is to create incentives for creative effort."[21]  Unfortunately, copyright owners and attorneys have discovered unintended "incentives"—incentives to litigate—and are using their "creative effort" to craft profitable litigation strategies.  This is not the creativity the Framers had in mind when they wrote in the Constitution that Congress could enact laws that "promote the Progress of Science and useful Arts."[22]  Statutory damages distort incentives to create new works and reward companies that litigate over existing works, which are no longer, or never were, commercially viable.

U.S. copyright law attempts to create incentives to create new works, but, in reality, the promise of statutory damages creates an incentive to monetize a work though litigation even when the infringement results in nominal damage to the copyright holder.  This

---

[15]  Voltage Pictures amended its original complaint from 5,000 defendants to 24,595. *Comapre* Complaint at 1, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873, 2010 WL 4955131 (D.D.C. May 24, 2010), ECF No. 1 (naming 5000 Does), *with* First Amended Complaint for Copyright Infringement at 1, Voltage Pictures, LLC v. Vasquez, No. 1:10-cv-00873 (D.D.C. Apr. 22, 2011), ECF No. 143-1 (naming 24,595 Does).

[16]  Consolidated Status Report Pursuant to the Court's Direction of 3/1/11, at 4, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. Mar. 11, 2011), ECF No. 89 (Voltage was able to identify 3970 of 5000 defendants or about seventy-nine percent).

[17]  *See* Anderson, *supra* note 13 (suggesting ninety percent of targets will settle).

[18]  Sandoval, *supra* note 14.  This number is supported by Voltage's actual success rate of about 79%.  Consolidated Status Report Pursuant to the Court's Direction of 3/1/11 at 4, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. Mar. 11, 2011), ECF No. 89.

[19]  Enigmax, *Rights Holders Get 30% from Mass BitTorrent Litigation*, TORRENTFREAK (Mar. 31, 2010), http://torrentfreak.com/rights-holders-get-30-from-mass-bittorrent-litigation-100331/.

[20]  An additional $3.3 million in profit would increase the movie's domestic gross by about twenty percent.  *See* Moya, *supra* note 7.

[21]  Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 450 (1984).

[22]  U.S. CONST. art. I, § 8, cl. 8.

Article demonstrates how plaintiffs are monetizing infringement by enforcing copyrights though a litigation-based business model. Part II explains how the 1976 Copyright Act created incentives to litigate as a business model. Part III illuminates some of the issues surrounding mass copyright litigation, using *The Hurt Locker* litigation as an example. Part IV discusses various strategies to combat this type of litigation. Lastly, Part V concludes that the most effective and equitable way to handle copyright enforcement in the Internet Age is to remove statutory damages from the U.S. copyright law.

II. BACKGROUND

A. *The Copyright Act of 1976*

The Constitution grants Congress the power to create laws to protect authors' rights in their works.[23] The Constitution provides that "[t]he Congress shall have Power To . . . promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."[24] The 1976 Copyright Act (the Copyright Act) governs copyright protections for works created after 1977.[25] The Copyright Act protects "original works of authorship fixed in any tangible medium of expression," such as motion pictures and sound recordings.[26] These protections give copyright holders various rights, including the exclusive right to reproduce, distribute, or prepare derivative works from the copyrighted work.[27]

The Copyright Act also provides damages for infringement of an owner's rights.[28] A copyright holder can elect for either the actual damages caused by the infringement as well as the profits the infringer generated, or for statutory damages.[29] Statutory damages generally range from $750 to $30,000.[30] If the court finds the infringement will-

---

[23] *Id.*

[24] *Id.*

[25] 17 U.S.C. § 102(a) (2006).

[26] *Id.*

[27] 17 U.S.C. § 106(1)–(3).

[28] 17 U.S.C. § 504.

[29] 17 U.S.C. § 504(c)(1).

[30] *Id.*

ful, it has the discretion to raise the statutory award to as much as $150,000.[31]  On the other hand, statutory damage awards can be as low as $200 if the defending party can prove that it was unaware that its acts infringed on the owner's copyrights.[32]  Because the copyright holder has the choice between statutory damages and actual damages, and statutory damages will often be significantly higher than actual damages, the copyright holder will likely select statutory damages.

B.  *A Deterrence-Based Litigation Model: Early Litigation Strategies of the RIAA*

Blaming file sharing over peer-to-peer networks for sharp declines in sales, the Recording Industry Association of America (RIAA) employed a litigation strategy to curb the illegal distribution of its content on the Internet.[33]  Initially, the strategy focused on litigating against peer-to-peer software providers, such as Napster,[34] for facilitating infringement.[35]  The RIAA succeeded in shutting down Napster in 2000, but this just prompted users to switch to new networks that lacked centralized servers.[36]  Facing difficulty in suing companies that offered services without centralized servers,[37] the RIAA began to sue individual infringers.[38]  However, the lawsuits against individuals were largely seen as a failure.[39]  The RIAA was unable to stop illegal downloading of copyrighted material—in fact, peer-to-peer

---

[31]  17 U.S.C. § 504(c)(2).

[32]  *Id.*

[33]  Stacey M. Lantagne, *The Morality of MP3s: The Failure of the Recording Industry's Plan of Attack*, 18 HARV. J.L. & TECH. 269, 275–76 (2004).

[34]  Napster allowed its users to search for digital audio files stored on other Napster users' computers and copy those files from one computer to another over the Internet.  Ashley R. Hudson, Comment, *Can't Get No Satisfaction: The Rise (and Fall?) of Grokster and Peer-to-Peer File Sharing*, 59 ARK. L. REV. 889, 899 (2007).  In 2000, Napster was shut down because of its active role in promoting copyright infringement.  *Id.* at 900.

[35]  *Id.* at 276.  Early peer-to-peer file sharing networks relied on a central server to manage available files and connect users.  EBU TECHNICAL, PEER-TO-PEER (P2P) TECHNOLOGIES AND SERVICES 29-30 (2010), *available at* http://tech.ebu.ch/docs/techreports/tr009.pdf.  EBU TECHNICAL, PEER-TO-PEER (P2P) TECHNOLOGIES AND SERVICES 29-30 (2010), *available at* http://tech.ebu.ch/docs/techreports/tr009.pdf.

[36]  *See* Lantagne, *supra* note 33, at 277.

[37]  *Id.*

[38]  *Id.* at 284.

[39]  *See generally RIAA v. The People: Five Years Later*, ELECTRONIC FRONTIER FOUND., https://www.eff.org/wp/riaa-v-people-five-years-later.

2012]        SHEDDING LIGHT ON COPYRIGHT TROLLS            85

usage grew.[40]  Furthermore, the lawsuits cost the record companies the goodwill of consumers and became a "money pit."[41]  In a five-year period the RIAA spent roughly $90 million on legal fees to recover only $2.5 million.[42]  In 2008, the RIAA ended its strategy of deterrence through litigation.[43]  Instead, the RIAA now works directly with certain Internet Service Providers (ISPs) to send notices to infringing users.[44]  After witnessing the RIAA's failure to deter infringement through litigation, commentators criticized the use of litigation to recover losses from file sharing as economically ineffective.[45]

---

[40] *Id.* at 9–10.

[41] *Id.* at 10–11.

[42] RIAA, IRS Form 990, Return of Organization Exempt from Income Tax (2004), at 1, 6 *available at* http://dynamodata.fdncenter.org/990_pdf_archive/131/131669037/131669037_ 200503_990O.pdf (listing legal fees of $15,125,544 and anti-piracy recovery of $551,816); RIAA, IRS Form 990, Return of Organization Exempt from Income Tax (2005) at 2, 8 *available at* http://dynamodata.fdncenter.org/990_pdf_archive/131/131669037/131669037_ 200603_990O.pdf (listing legal fees of $17,341,694 and anti-piracy recovery of $614,239); RIAA, IRS Form 990, Return of Organization Exempt from Income Tax (2006), at 2, 8 *available at* http://dynamodata.fdncenter.org/990_pdf_archive/131/131669037/131669037_ 200703_990O.pdf (listing legal fees of $19,419,701 and anti-piracy recovery of $455,643); RIAA, IRS Form 990, Return of Organization Exempt from Income Tax (2007), at 2, 8 *available at* http://dynamodata.fdncenter.org/990_pdf_archive/131/131669037/131669037_ 200803_990O.pdf (listing legal fees of $21,223,792 and anti-piracy recovery of $515,929); RIAA, IRS Form 990, Return of Organization Exempt from Income Tax (2008), at 8, 9 *available at* http://dynamodata.fdncenter.org/990_pdf_archive/131/131669037/131669037_ 200903_990O.pdf (listing legal fees of $17,696,912 and anti-piracy recovery of $391,348).

[43] Thomas Ricker, *RIAA Finds its Soul, Will Stop Suing Individuals Downloading Music*, ENGADGET (Dec. 19, 2008, 6:16 AM), http://www.engadget.com/2008/12/19/riaa-finds-its-soul-will-stop-suing-individuals-for-music-pirac/.

[44] *About Copyright Notices*, RIAA, http://www.riaa.com/toolsforparents.php?content_ selector=resources-music-copyright-notices (last visited Feb. 3, 2012).  The notice "is a warning that we have detected unlawful downloading or distribution from your computer and it is meant to put you on notice that this activity should stop." *Id.*

[45] Robert E. Thomas, *Vanquishing Copyright Pirates and Patent Trolls: The Divergent Evolution of Copyright and Patent Laws*, 43 AM. BUS. L.J. 689, 712 (2006).  While the RIAA did not recover enough money to cover its legal expenses, the RIAA's strategy was deterrence, not profit.  ELECTRONIC FRONTIER FOUND., *supra* note 39.  The RIAA had to consider a strategy that would best protect its industry's intellectual property as well as avoid alienating its clients' customers.  *Id.*  Furthermore, because the RIAA is a non-profit organization supported by its member recording labels, the RIAA model may not have conclusively shown that enforcement based business models were unprofitable.  *See, e.g.*, RIAA, Form 990, Return of Organization Exempt from Income Tax (2004), *available at* http://dynamodata.fdncenter.org/ 990_pdf_archive/131/131669037/131669037_200503_990O.pdf (showing membership dues representing over ninety-five percent of revenue).

## C.   *A Profit-Based Litigation Model: The Rise of the Copyright Troll*

A copyright troll is a plaintiff who seeks damages for infringement upon a copyright it owns, not to be made whole, but rather as a primary or supplemental revenue stream.[46]   Although the term is just recently gaining widespread use, the practice of monetizing copyright infringement as a business model is over a century old.   The first real copyright troll, Harry Wall, appeared in England in the 1870s.[47]   Wall purchased "public performance rights" that were otherwise unenforced.[48]   He then enforced those rights against infringers with a statutory penalty of 40 shillings.[49]   This troll, like many that came after him, found that enforcing copyrights with a statutory penalty could be more profitable than creating new works.

### 1.   Sampling: The Opportunist Troll

Sample trolls, a subset of copyright trolls, have made millions by suing popular music artists who have incorporated a part of a copyrighted work (a sample) into their own songs.[50]   Sample trolls, such as Bridgeport Music Inc., purchase the rights to older copyrighted works, then listen to new music for elements of songs it owns.[51]   When a sample troll finds music that uses elements of a song in its catalog, it sues the artist for creating an unauthorized derivative work.[52]   Sample trolls, like Bridgeport Music, do not represent the original artist, but are merely catalog companies that create profits by suing infringers of copyrights they have purchased.[53]

---

[46] Ben Jones, *Copyright Trolls, Not Just for Patents Anymore*, TORRENTFREAK (Sept. 20, 2010), http://torrentfreak.com/copyright-trolls-not-just-for-patents-anymore-100920/.

[47] Lionel Bently, *R. v The Author: From Death Penalty to Community Service—20th Annual Horace S. Manges Lecture, April 10, 2007*, 32 COLUM. J.L. & ARTS 1, 11 (2008).

[48] *Id.*

[49] *Id.*

[50] Tim Wu, *Jay-Z Versus the Sample Troll: The Shady One-man Corporation That's Destroying Hip-hop*, SLATE (Nov. 16, 2006, 1:50 PM), http://www.slate.com/id/2153961/.   A "sample" is a few notes from another work that is repeated, or looped, throughout a new song. *Id.*

[51] *Id.*   For example, Bridgeport owns the copyright to many of George Clinton's works that have been sampled in many popular hip-hop songs.   *Id.*   There is also controversy about the methods Bridgeport used in securing its copyrights, including those of Clinton.   *See id.*

[52] *Id.*   The infringement can be of as little as just a few notes.   *Id.*

[53] Joshua Crum, *The Day the (Digital) Music Died: Bridgeport, Sampling Infringement, and a Proposed Middle Ground*, 2008 B.Y.U. L. REV. 943, 953 (2008); Wu, *supra* note 50.

Sample trolling is not limited to new music.  In 1990, Larrikin Publishing bought the rights to a nursery rhyme called *Kookaburra* written in 1932.[54]  Seventeen years later, an Australian quiz show asked contestants to spot the similarity between *Kookaburra* and the flute riff in *Down Under* from the band Men at Work.[55]  Despite the widespread popularity of *Down Under*,[56] Larrikin did not notice the similarity until the quiz show pointed it out.  Larrikin then sued Men at Work in Australian Federal Court for unlicensed use of the flute riff.[57]  After a "qualitative and quantitative consideration of [*Kookaburra*]'s contribution to [*Down Under*], looked at [as] a whole", the Australian court found that Larrikin should receive five percent of royalties, starting from 2002,[58] amounting to nearly $100,000 AUD.[59]

In the United States, there have also been copyright suits targeting popular music despite the passage of a considerable amount of time.  In 2010, Drive-In Music Company filed suit against Sony BMG Entertainment for allegedly using a sample from *Come On In* by Music Machine in the 1991 release of Cyprus Hill's *How I Could Just Kill a Man*.[60]  The later song was widely popular and reached No. 77 on the Billboard chart in 1992[61] and No. 37 on the Billboard Alternative Songs chart as a cover by Rage Against the Machine in 2001.[62]  Like *Down Under*, *How I Could Just Kill a Man* achieved widespread

---

[54] Hilary Whiteman, *Judge says Men at Work's 'Down Under' Mimics Nursery Rhyme*, CNN (Feb. 4, 2010), http://articles.cnn.com/2010-02-04/entertainment/down.under.kookaburra_1_australian-law-riff-colin-hay?_s=PM:SHOWBIZ.

[55] *Id.*

[56] *Down Under* was a Billboard number one hit in 1983.  JOEL WHITBURN, THE BILLBOARD BOOK OF TOP 40 HITS 420 (9th ed. 2010).

[57] Whiteman, *supra* note 54.

[58] Larrikin Music Publishing Pty Ltd v. EMI Songs Australia Pty. Ltd. (No 2) (2010) FCA 698, ¶¶ 217-22 (Austl.), *available at* http://www.austlii.edu.au/au/cases/cth/FCA/ 2010/698.html.

[59] *Court Decides on MEN AT WORK "Down Under" Plagiarism Case*, MOG (July 2010), http://mog.com/blog_post/content/439/2113728.

[60] Complaint at 1-6, Drive-In Music Co. v. Sony Music Entm't, No. 2:10-cv-06745 (C.D. Cal. Sept. 10, 2010), ECF No. 1.

[61] *How I Could Just Kill a Man—Cypress Hill*, BILLBOARD, http://www.billboard.com/#/song/cypress-hill/how-i-could-just-kill-a-man-the-phuncky/1482345 (last visited Feb. 3, 2012).

[62] *How I Could Just Kill a Man—Rage Against the Machine*, BILLBOARD, http://www.billboard.com/#/song/rage-against-the-machine/how-i-could-just-kill-a-man/2792718 (last visited Oct. 17, 2010).

88        UCLA ENTERTAINMENT LAW REVIEW     [Vol. 19:1

commercial success for a considerable length of time before the
copyright holder chose to enforce its rights under the Copyright Act.

It is uncertain whether copyright enforcement was meant to protect
a use where the original was not commercially successful, rights were
not asserted until well after the commercial success of the derivative
work, and the original is only used in a limited fashion.[63]  Under these
circumstances, statutory damages create a windfall for a minimally
injured plaintiff.  Motivated by copyright law incentives, sample trolls
are able to make money simply by enforcing rights in old works
without creating their own new works.[64]  While sample trolling is a
form of copyright trolling, sample trolls sue for actual damages rather
than statutory damages because they are motivated by the commercial
success of a derivative work.[65]

### 2.   Online News: Individual Suits as a Business Model

In contrast to sample trolls, statutory damages create incentives for
another type of troll, the online news troll.  For example, Righthaven
LLC turned into a litigation-based business when it purchased the
copyrights of various newspapers' content, notably content from the
*Las Vegas Review-Journal*, and began to sue users that reposted old
articles on other websites.[66]  By July 2011, Righthaven had filed 276
lawsuits and recovered an estimated $352,500 in 141 settlements.[67]  In
their complaints, Righthaven sought permanent injunctions, statutory
damages, attorney fees, and costs, and demanded ownership of the
domain name of the infringing website.[68]  Righthaven has been willing
to settle for around $5000,[69] which is far less than the cost of hiring an
attorney to defend against infringement claims, and it has the

---

[63] *See* Jones, *supra* note 46.

[64] Crum, *supra* note 53, at 953.

[65] Complaint at 7, Drive-In Music Co. v. Sony Music Entm't, No. 2:10-cv-06745 (C.D. Cal. Sept. 10, 2010), ECF No. 1.

[66] David Kravets, *Newspaper Chain's New Business Plan: Copyright Suits*, WIRED (July 22, 2010, 3:29 PM), http://www.wired.com/threatlevel/2010/07/copyright-trolling-for-dollars/.

[67] RIGHTHAVEN LAWSUITS, http://www.righthavenlawsuits.com (last visited Feb. 3, 2012).

[68] *See, e.g.*, Complaint and Demand for Jury Trial at 6, Righthaven LLC v. Silver Matrix LLC, No. 2:10-cv-01281 (D. Nev. July 29, 2010), ECF No. 1.

[69] Cristina Silva, *Free Speech Group Fights Lawsuits vs. News Sharers*, ASSOCIATED PRESS, Sept. 30, 2010, *available at* http://www.washingtontimes.com/news.2010.free-speech-group-fights-lawsuits-vs-news-sharers/.

advantage of precluding the chance of losing at trial.[70]   Therefore, it is not surprising that many Righthaven defendants were quick to settle, despite the possibility of a strong fair use[71] defense.[72]   Righthaven, like a sample troll, uses copyright law, not to protect its property from unlicensed use, but rather to generate profit from that use even in the absence of articulable harm to Righthaven.

Despite Righthaven's ability to generate income through its litigation model, the effort, like that of the RIAA, has been described as a failure.[73]   Righthaven has been ordered to pay attorney's fees in several cases it pursued, including $116,718 for proceeding against a defendant without proper standing.[74]   As of November 10, 2011,

---

[70] Robert W. Zelnick, *Guest Post: Open Season on Copyright Infringement Claims? All Hail, or Hate, the "Troll"?*, PATENTLYO (Sept. 21, 2010, 12:28 PM), http://www.patentlyo. com/patent/2010/09/zelnick-copyright-trolls.html.

[71] The Copyright Act contemplates that not every use will be subject to liability and contains "fair use" provisions. 17 U.S.C. § 107 (2006). Fair use removes liability for certain activities that would otherwise constitute infringement. *Id.* The Act lists four factors to consider including whether the use is commercial or non-commercial, the nature of the work, the amount of the work used in relation to the work as a whole, and the effect of the use on the work's potential market. *Id.* Fair use analysis is fact driven, which creates uncertainty about how the doctrine will be applied in any given situation. BRUCE P. KELLER & JEFFREY P. CUNARD, COPYRIGHT LAW §8:1 (2007). However, it is clear that uploading media files on the Internet is not protected by fair use. Justin Hughes, *On the Logic of Suing One's Customers and the Dilemma of infringement-Based Business Models*, 22 Cardozo Arts & Ent. L.J. 725, 736 (2005).

[72] Zelnick, *supra* note 70. On the other hand, at least one defendant filed a motion to dismiss for lack of personal jurisdiction. Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Lack of Personal Jurisdiction at 1–2, Righthaven LLC v. Dr. Shezad Malik Law Firm P.C., No. 2:10-cv-00636 (D. Nev. June 2, 2010), ECF No. 8. Using the "effects test" from Calder v. Jones, the court held that "jurisdiction over petitioners in California [was] proper because of their intentional conduct in Florida calculated to cause injury to respondent in California." Calder v. Jones, 465 U.S. 783, 791 (1984). Because the defendant knew the copyrights were owned by a Nevada company and the defendant willfully infringed on the copyright of the owner, these facts "alone [were] sufficient to satisfy the 'purposeful availment' requirement" of personal jurisdiction. Righthaven LLC v. Dr. Shezad Malik Law Firm P.C., No. 2:10-cv-00636 (D. Nev. Sept. 2, 2010), ECF No. 15 (order denying defendant's motion to dismiss for personal jurisdiction).

[73] *See* Brad A. Greenberg, *The Quick Rise and Fall of the Copyright Troll—and How One Accidentally Expanded Fair Use* (Working Paper 2011), *available at* http://papers.ssrn.com/ sol3/papers.cfm?abstract_id=1947601.

[74] Righthaven, LLC v. DiBiase, No. 2:10-cv-01343 (D. Nev. Oct. 26, 2011), ECF No. 96 (order granting defendant's motion for attorney's fees and costs). The court considered the "various non-exclusive factors approved by the Supreme Court in Fantasy, Inc. v. Fogerty, 510 U.S. 517, 534 n.19 (1994), specifically: 'frivolousness, motivation, objective reasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Id.* Standing was denied based on an invalid assignment of rights of the copyrighted works. *Id.*

Righthaven had been ordered to pay over $225,000 including legal fees and a $5000 sanction for misleading the court.[75]  While these costs cut into Righthaven's profit margin, they do not disprove the Righthaven model.  Because these costs do not represent a failure of Righthaven's substantive claims, Righthaven's mistakes merely caution others to follow correct procedure.

### 3.   File Sharing: Mass-Litigation as a Business Model

Unlike sample trolls and online news trolls who sue individuals to recover lost profits from illegal distribution of the copyrighted work, Voltage Pictures sought statutory damages from unknown defendants for infringement of *The Hurt Locker*.[76]  Dunlap, Grubb & Weaver, PLLC (DGW),[77] the firm that represented Voltage Pictures explained that the firm was "creating a revenue stream and monetizing the equivalent of an alternative distribution channel."[78]  *The Hurt Locker* litigation may have been just a "test run" for DGW of an even higher volume mass-litigation model to generate profits through the threat of statutory damages.[79]

Despite the possibility that some infringers will fight back in court, the copyright troll industry has been "multiplying like especially fertile rabbits" to scour the Internet in the hope of monetizing copyright

---

[75] Righthaven, LLC v. Democratic Underground, No. 2:10-cv-01356 (D. Nev. Sept. 2, 2010), ECF No. 137 at 12–17 (oral order sanctioning Righthaven for misleading the court regarding Righthaven's agreement with the original content owner of the works at issue); RIGHTHAVEN LAWSUITS, http://www.righthavenlawsuits.com (last visited Feb. 3, 2012) (figures are accurate as of June 22, 2011).

[76] Quaid*, The Hurt Locker Sues the Pirates: Mad Grab for Cash?*, MOVIECHOPSHOP (June 3, 2010), http://moviechopshop.com/2010/06/03/the-hurt-locker-sues-the-pirates-mad-grab-for-cash/.

[77] DGW is also known as US Copyright Group, which was caught stealing the design and code for its website from a competitor.  Matthew Rogers, *U.S. Copyright Group Caught Stealing Competitor's Code*, DOWNLOADSQUAD (July 31, 2010, 1:00 PM), http://www.downloadsquad.com/2010/07/31/u-s-copyright-group-caught-stealing-competitors-code/.

[78] Eriq Gardner, *New Litigation Campaign Quietly Targets Tens of Thousands of Movie Downloaders*, HOLLYWOOD REP. (Dec. 21, 2010), http://www.hollywoodreporter.com/blogs/thr-esq/litigation-campaign-quietly-targets-tens-63769.

[79] *Id.*  DGW represents other movie studios in their own mass-litigation efforts.  First Amended Complaint, Doc. 12 at 1, Achte/Neunte Boll Kino Beteiliguns GMBH & Co. KG v. Does 1–4,577, No. 1:10-cv-00453, 2010 WL 2553274 (D.D.C. May 12, 2010) (listing 4,577 defendants); First Amended Complaint at 1, Call of the Wild Movie, LLC v. Does 1–1,062, No. 1:10-cv-00455 (D.D.C. May 12, 2010), ECF No. 1 (listing 1062 defendants); First Amended Complaint for Copyright Infringement at 1, West Bay One, Inc. v. Does 1–1,653, No. 1:10-cv-00481 (D.D.C. July 27, 2010), ECF No. 30 (listing 1653 defendants).

infringement.[80]   Nearly 100,000 Does were named in copyright law-suits over a period of thirteen months, starting from January 1, 2010.[81] The numbers are staggering considering it took the RIAA five years to sue 35,000 individuals.[82]   These defendants represent only part of the infringement of a handful of copyright properties,[83] evoking "flood-gate" analogies if the copyright troll's mass litigation model gains widespread legal acceptance.   The new mass-litigation model embraces infringement and removes the risk of loss from the copyright holder by employing a contingency fee structure.[84]   In a reversal from the normal contingency fee structure, the client only keeps around 30 percent, while the law firm keeps the remaining 70 percent.[85]   According to a company specializing in this type of litigation, this fee structure allows copyright holders to "monetize peer-to-peer (P2P) activity and realize revenues from an unexpected source—Internet piracy."[86]

---

[80] Nate Anderson, *US Anti-P2P Law Firms Sue More in 2010 Than RIAA Ever Did*, ARS TECHNICA (Oct. 9, 2010), http://arstechnica.com/tech-policy/news/2010/10/us-anti-p2p-law-firms-sue-more-in-2010-than-riaa-ever-did.ars.

[81] Ernesto, *100,000 P2P Users Sued in US Mass Lawsuits*, TORRENTFREAK (Jan. 30, 2011), http://torrentfreak.com/100000-p2p-users-sued-in-us-mass-lawsuits-110130/. An-other player in the copyright troll area is the Adult Copyright Company, which represents adult films. *See* Greg Sandoval, *Porn Studios' Copyright Lawyer: 'I Will Sue' (Q&A)*, CNET (Oct. 5, 2010, 8:49 AM), http://news.cnet.com/8301-31001_3-20018566-261.html. Holders of the copyrights to adult films may be rewarded with individuals who are more willing to settle due to the stigma of being named in a pornography lawsuit. *See id.*

[82] Will Moseley, *A New (Old) Solution for Online Copyright Enforcement After* Thomas *and* Tenenbaum, 25 BERKELEY TECH. L.J. 311, 315 (2010).  *But see* Anderson, *supra* note 13 (estimating that the RIAA filed at about 18,000 suits).

[83] *See* Anderson, *supra* note 80.

[84] *Id.*

[85] *See* Enigmax, *supra* note 19.   It is estimated that Righthaven's total cost to sue an individual is $1300.   Steve Green, *Judge Questions Righthaven Over R-J Copyright Suit Costs*, LAS VEGAS SUN (Aug. 26, 2010), http://www.lasvegassun.com/news/2010/aug/ 26/judge-questions-righthaven-over-r-j-copyright-suit/.   If the average settlement is $5000, and the law firm keeps 70%, then the law firm grosses $3500, netting $2200 per settlement.

[86] *Peer to Peer Collect*, COPYRIGHT ENFORCEMENT GROUP, http://web.archive.org/web/ 20100412160856/http://www.copyrightenforcementgroup.com/p2p.html (accessed by searching for copyrightenforcementgroup.com/p2p.html, archived on April 12, 2010, in the Internet Archive index).

III. A Closer Look at Mass Litigation[87]

A mass-litigation business model raises numerous procedural questions and issues at every step of the process, many of which have been answered in the course of *The Hurt Locker* litigation. This Part examines *The Hurt Locker* litigation to illuminate those issues that have been resolved, as well as those that remain. First, this Part addresses identification of possible defendants. Second, this Part discusses the methods copyright trolls employ to keep litigation costs down. Finally, this Part addresses the unequal bargaining positions of copyright trolls and defendants.

A. *Identifying Infringement*

The Internet has allowed copyrighted materials to propagate in ways that the Copyright Act's drafters could not have predicted. With the introduction of Internet peer-to-peer technologies, ordinary Internet users have gained the ability to become large-scale copyright infringers.[88] These peer-to-peer technologies revealed a gap between what the law proscribes and the norms that exist on the Internet, creating a "nation of constant infringers."[89]

While peer-to-peer technologies facilitated widespread infringement, the structure of the Internet also made acts of infringement traceable through Internet protocol (IP) log databases generated by ISPs.[90] Every computer on the Internet is assigned an IP address that is used to locate and identify other computers.[91] In a peer-to-peer network, two computers connect via their IP addresses while one computer distributes a file (uploading) and the other computer receives the content (downloading).[92] IP addresses are not fixed to a particular user because most residential computers do not maintain the same IP

---

[87] The purpose of this Part is to give the reader a better understanding of the way the availability of statutory damages is driving a new litigation strategy based on questionable legal ground and is a misuse of the legal system.

[88] John Tehranian, *Infringement Nation: Copyright Reform and the Law/Norm Gap*, 2007 Utah L. Rev. 537, 543 (2007).

[89] *See id.*

[90] *Id.* at 549.

[91] Jeff Tyson, *How Internet Infrastructure Works*, HowStuffWorks.com (Apr. 3, 2001), http://computer.howstuffworks.com/internet/basics/internet-infrastructure5.htm. *See* Paul Ohm, *Broken Promises of Privacy: Responding to the Surprising Failure of Anonymization*, 57 UCLA L. Rev. 1701, 1739 (2010) (comparing IP addresses to social security numbers).

[92] EBU Technical, *supra* note 33, at 25.

address indefinitely, but rather cycle through a finite list of IP addresses owned by the ISP.[93]   To track an IP address, the ISP can determine which subscriber was assigned the IP address at a given time.[94]   Therefore, to identify a suspected infringer, the copyright holder needs to supply a user's IP address and the time the infringement occurred to an ISP to learn the identity of the infringer.[95]

To obtain the necessary data, DGW hired a company to monitor peer-to-peer networks for illegal distribution of *The Hurt Locker*.[96] The exact methods used to gather IP addresses are a tightly held trade secret,[97] but commentators have demonstrated simple and effective ways to gather this data.[98]   The addresses are then checked for quality control and screened based on the chance of success.[99]   At this point, the data merely consists of strings of numbers that still must be cross-referenced against an IP log to identify an unique individual.[100]   The

---

[93] Tyson, *supra* note 91.

[94] *ISP Log—So What's Recorded to Your IP Address*, ANONYMOUS SURFING (Mar. 8, 2010, 4:07 PM), http://www.anonymous-proxies.org/2009/03/isp-log-so-whats-recorded-to-your-ip.html ("The ISP log stores details of every web site, every email you send, every message you post on a forum or blog.").

[95] This information is obtained by requesting files from computers that the investigator believes belong to the copyright holder. *See infra* Part III.A.

[96] Plaintiff's Opposition to Motions to Quash/Motions to Dismiss at 5, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873, 2010 WL 4954765 (D.D.C. Oct. 18, 2010), ECF No. 13.

[97] DGW hired Guardaley Ltd. to collect data using a "proprietary tracing software program to trace the IP address for each Defendant." *Id.* Guardaley gathered the IP address of the suspect user, the time of the infringement, the ISP of the user and a note of the property being distributed. Exhibit C to Motion for Leave for Discovery (Hurt Locker), Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. June 7, 2010), ECF No. 4-3. The data collected concerning the *Hurt Locker* was gathered in about one week. *Id.*

[98] Ben Jones, *How Any BitTorrent User Can Collect Lawsuit Evidence,* TORRENTFREAK (Sept. 03, 2010), http://torrentfreak.com/how-any-bittorrent-user-can-collect-lawsuit-evidence-100903/. Jones also opines that the data gathered may not be particularly reliable. *Id.* Gaurdaley explained that to identify infringers they download portions of the copyrighted property from a user. Declaration of Patrick Achache in Support of Plaintiff's Motion for Leave to Take Discovery Prior to Rule 26(f) Conference at ¶¶ 8-9, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. June 7, 2010), ECF No. 4-2.

[99] BEING THREATENED?, THE SPECULATIVE INVOICING HANDBOOK 21 (2009), *available at* http://www.beingthreatened.com/resources/The-Speculative-Invoicing-Handbook.pdf. For example, because the data can be screened by ISP, IP addresses belonging to individuals beyond the jurisdiction of the Copyright Act may be screened out. *See* Exhibit C to Motion for Leave for Discovery (Hurt Locker), Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. May 24, 2010), ECF No. 4-3.

[100] *See id.*

copyright holder's inability to identify the infringer by name creates quasi-anonymity that allows many file sharers to avoid detection.[101] While a copyright holder cannot identify the specific individual infringer based on an IP address, the information can be cross-referenced against IP log databases kept by ISPs to determine the identity of the subscriber.[102]   Matching an IP address to an individual requires ISP cooperation to identify the subscriber that was using the particular IP address at the supplied time.[103]   Not all ISPs have been willing to freely share this information,[104] and without the ISP's logs, copyright holders are unable to identify subscribers.[105]   To compel records from an ISP, the copyright holder must first file a complaint to get the power to subpoena.[106]   The complaint, therefore, is the gateway to identifying an infringer.

---

[101]   Thomas, *supra* note 45, at 719.

[102]   Tehranian, *supra* note 88, at 549.

[103]   *Frequently Asked Questions for Subpoena Targets*, ELECTRONIC FRONTIER FOUND., http://www.eff.org/pages/frequently-asked-questions-subpoena-targets (last visited Feb. 3, 2012).  There is a limit to the length of time ISPs retain the logs, so a plaintiff must act swiftly. *See* Comcast Legal Response Center, Comcast Cable Law Enforcement Handbook 10 (2007), http://www.fas.org/blog/secrecy/docs/handbook.pdf (explaining that Comcast keeps its ISP logs for 180 days).

[104]   *E.g.*, Motion to Quash and Objections to Subpoena at 1, Voltage Pictures, LLC v. Does 1–5000, No. 4:10-mc-00075 (S.D.S.D. Aug. 23, 2010), ECF No. 1.  The ISP Midcontinent Communications filed a motion to quash the subpoena from Voltage Pictures requesting information from IP log databases.  Brief in Support of Motion to Quash and Objections to Subpoena at 1–2, Voltage Pictures, LLC v. Does 1-5000, No. 4:10-mc-00075 (S.D.S.D. Aug. 23, 2010), ECF No. 2.; Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc., 351 F.3d 1229, 1231 (D.C. Cir. 2003), *cert. denied*, 543 U.S. 924 (2004).  While there is no law requiring ISPs to maintain logs unless notified to do so by the government, there has been legislation proposing that ISPs keep logs for as long as two years to aid criminal investigations. 18 U.S.C. § 2703(f) (2006) (requiring ISPs to preserve records for ninety days, extendable for another ninety days, but only upon request); Declan McCullagh, *Bill Proposes ISPs, Wi-Fi Keep Logs for Police*, CNET (Feb. 19, 2009), http://news.cnet.com/8301-13578_3-10168114-38.html.  The preservation statute is only available in criminal cases and the ISP has no legal duty under § 2703(f).  Paul K. Ohm, *Parallel-Effect Statutes and E-Mail "Warrants": Reframing the Internet Surveillance Debate*, 72 GEO. WASH. L. REV. 1599, 1605 (2004).  Under the plain language of § 2703(f), the duty to preserve would never arise if the information was deleted instantly, as notice would not have been received in time to preserve it. *See* 18 U.S.C. § 2703(f) (2006) (". . . upon the request of a governmental entity, shall take all necessary steps to preserve records . . .").

[105]   Declaration of Patrick Achache in Support of Plaintiff's Motion for Leave to Take Discovery Prior to Rule 26(f) Conference at ¶ 12, Achte/Neunte Boll Kino Beteiliguns GMBH & Co. KG v. Does 1–4,577, No. 1:10-cv-00453 (D.D.C. Mar. 18, 2010), ECF No. 4-2.

[106]   *See* Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc., 351 F.3d 1229, 1233 (D.C. Cir. 2003) (holding that the subpoena power of the Digital Millennium Copyright Act only authorizes the power to subpoena an ISP that stores the copyrighted material), *cert. denied*, 543 U.S. 924 (2004).  Prior to this decision, the RIAA was issuing subpoenas to ISPs

## B.  *Cost Reduction Techniques for Litigation*

Copyright trolls use different methods to keep litigation costs down.  For example, plaintiffs like Righthaven file suits against defendants with known identities and use a system of pleading where a model complaint is reused as a template.[107]  Alternately, plaintiffs, like Voltage Pictures, who only know the defendants' IP addresses, and not their identities, must file a lawsuit against each IP address to gain the power to subpoena ISPs for the records to match the addresses to identities.[108]  The cost to file a complaint in federal court is $350,[109] but DGW saved about $1.75 million in filing fees by filing Voltage Pictures' claims in a single complaint.[110]

This litigation model also requires a streamlined discovery process to identify alleged infringers.[111]  The primary method copyright holders utilize to streamline the discovery process is using single complaints that name thousands of defendants, as Voltage Pictures did.  Initially, the copyright holder must file a complaint naming each defendant as a "Doe" defendant.[112]  Once the identity of the infringer is discovered, the complaint is amended to recognize the real party to the

---

to obtain the identity of an alleged infringer before filing a complaint.  *Id.* at 1232.

[107]  *Compare* Complaint and Demand for Jury Trial at 1, Righthaven, LLC v. Smith, No. 2:10-cv-1031 (D. Nev. June 25, 2010), ECF No. 1, *with* Complaint and Demand for Jury Trial at 1, Righthaven, LLC v. AR15.com, LLC, No. 2:10-cv-01671 (D. Nev. Sept. 27, 2010), ECF No. 1.  Identities of owners of domain names are stored in a publicly accessible database called "Whois."  *Whois*, INTERNET CORP. FOR ASSIGNED NAMES AND NOS. (ICANN), http://gnso.icann.org/issues/whois/ (last visited Feb. 3, 2012).  It is possible to avoid being listed in the Whois database by registering a domain through a proxy service.  *See* DOMAINS BY PROXY, http://www.domainsbyproxy.com/default.aspx (last visited Feb. 3, 2012).  Law enforcement can obtain the identity of a domain owner by making an appropriate request.  *Id.*

[108]  *E.g.*, Complaint at 1, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873, 2010 WL 4955131 (D.D.C. May 24, 2010), ECF No. 1 (joining 5000 defendants in a single suit).

[109]  28 U.S.C. § 1914(a) (2006).

[110]  At least one judge has noticed that mass-litigation plaintiffs are filing their "actions on the cheap."  CP Productions, Inc. v. Does 1–300, No. 1:10-cv-06255, at 2 (N.D. Ill. Feb. 24, 2011), ECF No. 32 (order dismissing plaintiff's claims with prejudice for misjoinder and lack of personal jurisdiction).

[111]  *See* Notice of Dismissal With Prejudice, at 1–2, Mick Haig Productions v. Does 1–670, No. 3:10-cv-01900, 2011 WL 465745 (N.D. Tex. Jan. 28, 2011), ECF No. 9.

[112]  Alice Kao, *RIAA v. Verizon: Applying the Subpoena Provision of the DMCA*, 19 BERKELEY TECH. L.J. 405, 419 (2004).  In practice, suing a defendant as a Doe is acceptable when the plaintiff is unable to learn the name of the defendant.  2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE, ¶ 10.02 (3d. ed. 1997).

controversy.[113]   In mass litigation, a single complaint may join thousands of Does in a single suit.[114]

Joining thousands of defendants in a single suit, however, raises questions about the scope of the joinder rules.[115]   Voltage Pictures faced such a challenge brought by a possible defendant that claimed, inter alia, that joinder was inappropriate.[116]   In U.S. District Court for the District of Columbia, Voltage Pictures successfully argued that joinder considerations were "premature and inappropriate at [such an early] stage" of the proceedings.[117]   In contrast, U.S. District Court for the Eastern District of Pennsylvania found the joinder of 203 Doe defendants improper despite being in the same early discovery stages of litigation.[118]   It is worth noting again that the purpose of sustaining a valid complaint is to obtain the power to subpoena ISPs for their logs,

---

[113] *See* 3 MOORE ET AL., *supra* note 112, ¶ 15.16.

[114] *E.g.*, Complaint at 1, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873, 2010 WL 4955131 (D.D.C. May 24, 2010), ECF No. 1.

[115] *See* FED. R. CIV. P. 20:

> Persons . . . may be joined in one action as defendants if:
>
> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all defendants will arise in the action.

*Id.* at 20(a)(2).

[116] Omnibus Motion & Memorandum to Quash Subpoena Pursuant to Fed. R. Civ. P. 45(C)(3) and Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(12) at 24–26, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873, 2010 WL 4954764 (D.D.C. Oct. 12, 2010), ECF No. 12. The movant argued that Voltage's claims were not "'asserted against them jointly, severally or in the alternative'" nor did they "'aris[e] out of the same transaction, occurrence, or series of transactions or occurrences.'" *Id.* at 25 (quoting FED. R. CIV. P. 20(a)(2)(A)). Furthermore, the movant pointed out that "joinder based on separate but similar acts of copyright infringement over the internet has been repeatedly rejected by courts across the country." *Id.* (listing six separate instances where courts have rejected joinder in similar instances). Unfortunately, Voltage had not amended the complaint to reflect that the movant was actually a party and a "nonparty may not invoke the permissive joinder rule." 4 MOORE ET AL., *supra* note 112, ¶ 20.02; Plaintiff's Opposition to Motions to Quash/Motions at 8–9, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873, 2010 WL 4954765 (D.D.C. Oct. 18, 2010), ECF No. 13.

[117] *Id.*

[118] BMG Music v. Does 1–203, No. Civ.A. 04-650 (E.D. Pa. Apr. 2, 2004) (order to sever action). "[D]eferring consideration of the joinder issue is inappropriate despite the fact that it would reduce costs for Plaintiffs and mitigate the risk of disparate treatment at the hands of the learned Judges of this District." *Id.* Some courts have gone so far as to recommend sanctions for this type of joinder. *See* Eric Bangeman, *Magistrate Judge Suggests Sanctions Against RIAA Lawyers*, ARS TECHNICA (Jan. 30, 2008), http://arstechnica.com/tech-policy/news/2008/01/magistrate-judge-suggests-sanctions-against-riaa-lawyers.ars.

not necessarily to litigate against 5000 individuals in a single trial.[119] As will become clearer after a discussion of the unequal positions between the copyright troll and defendant,[120] success at this stage is merely identification of the alleged infringer.

Defeating joinder may be a short-lived victory because the result would only be the severance of the misjoined parties.[121]  The plaintiff would only have to re-file against each misjoined party.[122]  While the cost of re-filing each complaint would be an additional $350, the plaintiff would already have the identity of the alleged infringer and could therefore pursue a settlement before re-filing.[123]  Also, the court has the power to consolidate the actions after severance if the cases are in the same district and "involve a common question of law or fact."[124] Therefore, even if the defendant wins the joinder battle, in the end, the plaintiff still will have the power to subpoena the ISP.

## C.  Unequal Bargaining Power

The purpose of litigation in this circumstance is to seek settlements from identified infringers.[125]  This Part investigates the unequal bargaining power between suspected infringers and copyright holders. First, this Part discusses defendants' possible pre-trial responses to receipt of a settlement letter.  Second, this Part discusses how the pos-

---

[119] See Consolidated Status Report Pursuant to the Court's Direction of 3/1/11 at 4, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. Mar. 11, 2011), ECF No. 89 (withdrawing complaint against all defendants, but stating that Voltage will still seek settlement with identified infringers).

[120] See infra Part III.C.

[121] 4 MOORE ET AL., supra note 112, ¶ 20.02.

[122] Id.  Some defendants have also argued that the court lacked personal jurisdiction over them as a defendants.  See supra note 72.

[123] See infra Part III.C.

[124] 4 MOORE ET AL., supra note 112, ¶ 20.06 (quoting FED. R. CIV. P. 42(a)).  In DGW litigation relating to the movie Far Cry, the plaintiffs requested records for 809 IP addresses. Motion of Third Party Time Warner Cable Inc. to Quash or Modify Subpoena at 1–2, Achte/Neunte Boll Kino Beteiliguns GMBH & Co. KG v. Does 1–4,577, No. 1:10-cv-00453 (D.D.C. May 13, 2010), ECF No. 13.  The court ordered the plaintiff to pay costs relating to the production of the records as well as limited the requests to twenty-eight records per month. Doc. 12 at 1–2, Achte/Neunte Boll Kino Beteiliguns GMBH & Co. KG v. Does 1–4,577, No. 1:10-cv-00453 (D.D.C. July 2, 2010) (order granting motion to modify subpoena).

[125] See Consolidated Status Report Pursuant to the Court's Direction of 3/1/11, at 4, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. Mar. 11, 2011), ECF No. 89.

sibility of outlandish statutory damages creates overwhelmingly strong incentives to settle.

## 1. Settlement Letter

The subpoena to the ISP is the copyright troll's most critical tool. The subpoena directs the ISP to release the name and address of the subscriber of services relating to an identified IP address.[126] The identified subscriber is often sent a letter disclosing the information that the ISP will release and directing the individual to contact the issuing court if the individual seeks to quash the subpoena.[127] This initial letter may be enough to scare an individual to settle immediately.[128] Whether the ISP reveals the identity of the user, or the individual contacts the court to quash the subpoena, the plaintiff gains the true identity of the individual and can proceed against him or her.[129]

Once the copyright holder knows the identity of the alleged infringer, the holder sends out a settlement letter.[130] The purpose of this letter is to elicit a quick settlement.[131] The letters often cite the

---

[126] *E.g.*, Motion to Quash Subpoena at 4, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. Oct. 5, 2010), ECF No. 11. The subpoenas may also ask for the phone number, email address, and Media Access Control number (MAC). *Id.* A MAC address is used to identify hardware on a network. *Wireless Security*, ONGUARD ONLINE, http://www.ftc.gov/bcp/edu/microsites/onguard/ (last visited Feb. 3, 2012). It is worth noting that while in theory the MAC address can uniquely identify a piece of hardware, MAC addresses are capable of being "mimicked." *Id.*

[127] *E.g.*, Motion to Quash Subpoena at 3, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. Oct. 5, 2010), ECF No. 11. Generally, when a subpoena is issued against a nonparty, the nonparty must bring the motion to quash. 9 MOORE ET AL., *supra* note 112, ¶ 45.50. The nonparty can bring the motion if the subpoena concurs the "privileges or privacy interests" of the party. *Id.* Subscriber information given to ISPs is not a privacy interest that courts have been willing to accept. *E.g.*, Sony Music Entm't Inc. v. Does 1–40, 326 F. Supp. 2d 556, 566–67 (S.D.N.Y. 2004) (holding that "defendants' First Amendment right to remain anonymous must give way to plaintiffs' right to use the judicial process to pursue what appear to be meritorious copyright infringement claims").

[128] Eric Bangeman, *Leaked Letter Shows RIAA Pressuring ISPs, Planning Discounts for Early Settlements*, ARS TECHNICA (Feb. 13, 2007), http://arstechnica.com/old/content/2007/02/8832.ars. Plaintiffs also offer discount settlements to individuals who settle prior to filing the complaint in the name of the party. *Id.*

[129] *See id.* Doe defendants who are unable to show that their privacy concerns outweigh the "presumption of openness in judicial proceedings" will have to proceed under their true identities. Achte/Neunte Boll Kino Beteiligungs GMBH & Co. KG v. Does 1–4,577, No. 1:10-cv-00453, at 2–3 (D.D.C. Sept. 16, 2010) (order denying defendants' motion to proceed anonymously).

[130] Cohen, *supra* note 12, at 17.

[131] *Id.* Some letters have an increasing settlement amount if the recipient delays before settling. Mike Masnick, *Verizon Handing Over Names For US Copyright Group's Mass*

possibility of statutory damages of up to $150,000 available to a successful plaintiff.[132]  While this number is not entirely accurate,[133] it scares many defendants into settling.[134]  The individual is then offered the chance to settle for substantially less than the maximum statutory penalty.[135]  To facilitate settlement, some plaintiffs have created online payment portals that allow a defendant to settle a claim over the Internet.[136]

    To elicit a quick settlement, copyright holders rely on the vulnerability of the alleged infringers.[137]  Defendants might not be able to hire an attorney or fight the allegations in a court far from home, or they might be embarrassed by the nature of the infringement.[138]  This embarrassment factor is notably magnified when the material is pornographic in nature.[139]  In the case of popular movies and music,

---

*Automated Lawsuits*, TECHDIRT (June 1, 2010, 8:56 AM), http://www.techdirt.com/articles/20100601/0012509632.shtml.

[132] *Id.*

[133] *See* H.R. REP. NO. 94-1476, at 176 (1976), *reprinted in* 17 U.S.C. § 504 (stating the general rule that a court awarding statutory damages is "obliged to award between $250 and $10,000").  The House Report was written in 1976 when the maximum statutory damage award was $50,000.  General Revision of Copyright Law, Pub. L. No. 94-553, § 504(c) 90 Stat. 2541, 2585 (1976).  The maximum damages have been amended, and now the maximum statutory award is $150,000. 17 U.S.C § 504(c)(2) (2006).  If we assume that typical range in the House report was meant to be increased proportionally to the maximum statutory award, the recommendations would still "oblige" the court to award between $750 and $30,000, a far cry from the $150,000 maximum award.

[134] John E. Grant, *The Imageline Infringement Letter*, Imua Legal Advisors (Mar. 23, 2009), http://web.archive.org/web/20100715065300/http://www.imualaw.com/articles/2009/03/the-imageline-infringement-letter (accessed by searching for http://www.imualaw.com/articles/2009/03/the-imageline-infringement-letter, archived on July 15, 2010, in the Internet Archive index).

[135] Cohen, *supra* note 12, at 17 (stating that settlements range from $3000 to $6000); Sandoval, *supra* note 14 (estimating settlements of $2900).

[136] *See* COPYRIGHT SETTLEMENTS, *supra* note 14; *see also* DEFENDANT RECORD ID LOGIN, http://dglegal.force.com/SiteLogindglegal (last visited Feb. 10, 2012) ("All Major Credit Cards Accepted").

[137] Corynne McSherry, *A Field Guide to Copyright Trolls*, ELECTRONIC FRONTIER FOUND. (Sept. 20, 2010), http://www.eff.org/deeplinks/2010/09/field-guide-copyright-trolls.  Fraudsters have also sent out false settlement letters regarding fictitious infringement to trick individuals into settling a non-existent claim. Enigmax, *Scammers Want File-Sharers To Pay Cash Fines*, TORRENTFREAK (Oct. 21, 2010), http://torrentfreak.com/scammers-want-file-sharers-to-pay-cash-fines-101021/.  Because the fictitious letters are done so well, it is hard to tell them from a real settlement letter. *Id.*

[138] McSherry, *supra* note 137.

[139] Mike Masnick, *More Porn Companies Filing Mass Lawsuits Against File Sharers*, TECHDIRT (July 21, 2010, 4:57 PM), http://www.techdirt.com/articles/20100719/17330710283.

embarrassment may still create a strong incentive to settle, even if the accused infringer could argue a persuasive defense.[140]

Furthermore, because the cost of representation is often much greater than the cost to settle, many individuals settle despite strong defenses[141] including mistaken identity,[142] procedural violations,[143] or fair use.[144] For example, of the estimated 35,000 people sued by the RIAA over five years, only two cases went to trial.[145] On the other hand, if a defendant does not settle due to a valid defense or because of wrongful identification, the next step is trial.[146]

### 2. The Possibility of Trial

One possible defense at trial is misidentification.[147] Although the information that the plaintiffs gather can identify an ISP subscriber, the identification is not conclusive because the subscriber is not necessarily the infringing party.[148] First, a subscriber can be mis-

---

shtml (suggesting that many defendants will settle the matter if it relates to pornography to avoid embarrassment).

[140] *See id.*

[141] McSherry, *supra* note 13714; Zelnick, *supra* note 70. Legal defense costs could be as high as $100,000 to defend a copyright infringement lawsuit. Anthony Ciolli, *Lowering the Stakes: Toward a Model of Effective Copyright Dispute Resolution*, 110 W. VA. L. REV. 999, 1003–04 (2008). At least one attorney offered legal forms for sale on his website that pro se defendants could use to file motions with the court. Andy Chalk, *Copyright Lawyers Sue Lawyer Who Helped Copyright Defendants* (Nov. 26, 2010, 10:21 AM), http://www.escapistmagazine. com/news/view/105651-Copyright-Lawyers-Sue-Lawyer-Who-Helped-Copyright-Defendants. DGW moved for the attorney to receive sanctions to stop him from distributing the forms. Plaintiff's Opposition to Motions to Quash [Doc. No. 18] and Request for Sanctions at 6-8, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873, 2010 WL 4954767 (D.D.C. Nov. 22, 2010), ECF No. 19.

[142] *See, e.g.,* James Temple, *Lawsuit Says Grandma Illegally Downloaded Porn*, S.F. CHRON. (July 15, 2011), http://articles.sfgate.com/2011-07-15/business/29776291_1_firm-bittorrent-filing.

[143] *See, e.g.,* Omnibus Motion & Memorandum to Quash Subpoena Pursuant to Fed. R. Civ. P. 45(C)(3) and Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(12) at 5, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. Oct. 12, 2010), ECF No. 12.

[144] Zelnick, *supra* note 70.

[145] Moseley, *supra* note 82, at 311, 315. As of September 2010, no Righthaven defendant had chosen to litigate. Zelnick, *supra* note 70.

[146] It has also been suggested that settling can encourage more settlement letters because it shows the individual has the resources to pay and is unwilling to fight. BEING THREATENED?, *supra* note 99.

[147] Tehranian, *supra* note 88, at 549; ELECTRONIC FRONTIER FOUND., *supra* note 103.

[148] Julian Wilson, *Privacy of Internet Users, Internet File-Sharing and Copyright: The Present "Wild West" and the Digital Economy Act 2010*, PANOPTICON (Oct. 1, 2010), http://www.panopticonblog.com/tag/copyright-enforcement-tactics-against-isp-subscribers/.

identified as an infringer without participating in any infringing
behavior.[149]   Second, IP addresses can be purposefully "framed" by
malicious users.[150]   Third, there are reliability issues with using IP
addresses and timestamps to identify the correct party.[151]   For these
reasons, there are serious issues around the credibility of the evidence
used by copyright trolls.

Despite the defenses to the quality of evidence against alleged
infringers, the possibility of losing creates a strong incentive for
alleged infringers to avoid a judgment at trial.   In the first case brought
by the RIAA for sharing music files on the Internet, the defendant,
Jammie Thomas-Rasset, argued that an unknown third-party had
implicated her IP address by sharing 24 songs.[152]   Disbelieving her
story, the jury awarded the RIAA $222,000.[153]   In the retrial,[154]
Thomas-Rasset was represented *pro bono*.[155]   This time, Thomas-

---

Multiple users may share the same IP address and any one of those users can implicate the IP
address.  *Id.*  Unsecured wireless connections can allow unauthorized users to gain access to
the network and the user's activity will be attributable to the IP address of the ISP subscriber.
*Id.*

[149] MICHAEL PIATEK ET AL., CHALLENGES AND DIRECTIONS FOR MONITORING P2P FILE
SHARING NETWORKS—OR—WHY MY PRINTER RECEIVED A DMCA TAKEDOWN NOTICE 1
(2008), http://dmca.cs.washington.edu/uwcse_dmca_tr.pdf.  The authors were able to receive
403 false positive identification complaints including some sent to a networked printer.  *Id.* at
1–2.  However, the authors note that they did not receive pre-settlement letters.  *Id.* at 2.

[150] *Id.*  First, a client requesting a download can substitute another IP address for its own to
a bittorrent tracker.  *Id.* at 3.  Second, a user can also misreport its IP address when uploading a
torrent file.  *Id.*  Third, a malicious user in the network path between the user monitoring IP
address traffic and the bittorrent tracker can implicate another IP address.  *Id.* at 4.  Fourth,
malware on a user's computer can host and distribute copyrighted content without the users
knowledge or consent.  *Id.*

[151] *Id.*  When IP addresses are assigned dynamically, reassignment of an IP address from an
infringing user to an innocent user can cause the behavior of the infringing user to be attributed
to the innocent user.  *Id.*  Because the monitoring client (copyright holder) records information
from the tracker of the bittorrent client, the information can quickly become inaccurate and
will not implicate the correct user.  *Id.*  However, it seems that the methods used by Guardaley,
who gathered data for DGW, which include actually downloading data from infringers, would
give more reliable data than relying on trackers alone.  Declaration of Patrick Achache in
Support of Plaintiff's Motion for Leave to Take Discovery Prior to Rule 26(f) Conference at 8,
Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. June 7, 2010), ECF No. 4-
2.

[152] Greg Sandoval, *Odd-Couple Lawyers Aim to Save Jammie Thomas*, CNET (July 9,
2009), http://news.cnet.com/8301-1023_3-10283133-93.html.

[153] *Id.*

[154] The judge granted a retrial due to faulty jury instructions.  *Id.*

[155] *Id.*  The decision in the first trial was thrown out on defendant's motion due to faulty jury
instructions.  Capitol Records Inc. v. Thomas, No. 0:06-cv-01497 (D. Minn. Sept. 24, 2008),

Rasset lost with a jury verdict of $1.92 million.[156]  That award was challenged[157] and led to a third trial in which damages of $1.5 million were awarded.[158]  For many individuals, the prospect of large damage awards, multiple trials, and the resulting legal fees make a settlement of a few thousand dollars appealing.

Under the current structure of the law, large damage awards are often justified by the nature of the infringement.  First, sharing files over peer-to-peer networks is generally not accidental.[159]  Second, as DGW claims, sharing files via torrent "requires a fairly complex set of steps to set up" which "adds to the ultimate legal liability of the individual downloader."[160]  Therefore, DGW hopes to achieve higher damage awards than the RIAA if cases go to trial because both the length of a film and the cost to create one are greater than for a song.[161]  If large awards are justified by the statute, the issue then turns to whether the statute itself is justifiable in the age of Internet copyright trolls.

## IV. Addressing the Mass-Litigation Business Model

While there are other solutions that could combat the rise of copyright troll litigation, the best solution to realign the interests of the

---

ECF No. 197 (order granting defendants motion for a new trial); Sandoval, *supra* note 152.  In the second trial, the defendant argued that a former boyfriend or one of her children did the sharing.  *Id.*

[156] *Id.*  The verdict awarded $80,000 for each file shared. Judgment in a Civil Case at 1–2, Capitol Records Inc. v. Thomas, No. 0:06-cv-01497, (D. Minn. June 19, 2009), ECF No. 338.

[157] The judge remitted the damage award to $2250 per song.  Capitol Records Inc. v. Thomas, No. 0:06-cv-01497, at 37 (D. Minn. Sept. 24, 2008), ECF No. 336 (order granting defendants motion for remittitur).  The plaintiffs then offered to settle for $25,000, but Thomas rejected the offer.  Greg Sandoval, *Jammie Thomas Rejects RIAA's $25,000 Settlement Offer*, CNET (Jan. 27, 2010), http://news.cnet.com/8301-31001_3-10442482-261.html.  The plaintiffs then filed an objection to the remittitur, leading to a third trial.  Notice of Plaintiffs' Decision Re: Remittitur at 1, Capitol Records Inc. v. Thomas, No. 0:06-cv-01497, (D. Minn. June 19, 2009), ECF No. 371.

[158] Steven Musil, *Jammie Thomas Hit with $1.5 Million Verdict*, CNET (Nov. 3, 2010), http://news.cnet.com/8301-1023_3-20021735-93.html.  In the second case brought by the RIAA resulted in a judgment of $675,000, reduced to $67,500 against the defendant.  Jonathan Saltzman, *Judge Slashes Downloading Penalty,* Boston Globe (July 10, 2010), http://www.boston.com/news/local/massachusetts/articles/2010/07/10/file_sharing_damages_r educed_tenfold/.  He expressed that even the reduced award was "basically unpayable" to him.  *Id.*  Her lawyer, Harvard Law professor Charles Nesson planned to appeal the award.  *Id.*

[159] Sandoval, *supra* note 14.

[160] *Id.*

[161] *Id.*

public with the interests of copyright holders is to remove statutory damages. This Article does not argue that copyright infringement is morally justified or that the law should not protect copyright holders against infringement. Instead, this Article illuminates the incentive structure that leads to copyright holders' misuse of the judicial process to monetize infringement in ways that leave the targets with little choice but to settle. Removing statutory damages for copyright claims is the best policy for furthering the public's interest in copyright protection and relieving the courts, while still protecting the rights of copyright holders.

## A. Procedural Solutions Are Insufficient

Some have suggested that procedural changes could reduce the number of targeted individuals and therefore reduce the potential success of abusive litigation-based business models. For example, ISPs could choose not to keep IP address logs. While there might be no legal duty to store IP log data,[162] ISPs might be reluctant to give up those logs for fear of liability[163] and because the data is a potential source of revenue.[164] There might also be business-related reasons for keeping the logs, including monitoring network use, preventing fraud and settling billing disputes.[165]

A second procedural solution would be for judges to refuse joinder of thousands of defendants in a single suit. If a plaintiff had to sue users individually, the cost to determine each user's identity would increase,[166] encouraging copyright holders to be more selective in choosing defendants. But, it is also possible that plaintiffs would pass

---

[162] *See supra* note 104.

[163] ISPs may be cooperating to avoid legislation that would require retention of more extensive records. *See* Beth Pariseau, *ISPs Fear SAFETY Act Retention Requirements*, SEARCHSTORAGE (Mar. 1, 2007), http://searchstorage.techtarget.com/news/article/0,289142, sid5_gci1245803,00.html.

[164] Lauren Weinstein, *A Clear Case for ISP Regulation: IP Address Logging*, CIRCLEID (June 2, 2009, 11:16 AM), http://www.circleid.com/posts/20090602_isp_regulation_ip_address_logging/. Perhaps this revenue is greater than the cost of producing the data for subpoenas.

[165] Declan McCullagh, *GOP Revives ISP-Tracking Legislation*, CNET (Feb. 6, 2007), http://news.cnet.com/2100-1028_3-6156948.html.

[166] *See supra* Part III.B.

these costs along to defendants in the form of higher settlement requests.[167]

Finally, lawyer discipline tribunals could create rules that prevent the unethical devices used in copyright troll suits.[168]   Commentators have expressed outcry over the moral repugnancy of these suits.[169] Even before the rise of copyright trolls, Justice Burger wrote that when the public no longer supports the actions taken by lawyers, lawyer behavior needs to change.[170]   Recognizing this, the preamble of the Model Rules of Professional Conduct states that "a lawyer should further the public's . . . confidence in the rule of law . . . because legal institutions . . . depend on popular participation and support to maintain their authority."[171]   Unfortunately, procedural solutions can only offer limited relief because the prospect of large statutory damage awards would still encourage plaintiffs to find new ways of monetizing infringement.

## B. *Can We Learn Anything from the Patent Troll Problem?*

There is an obvious relation between the copyright troll and the patent troll.[172]   Patent trolls purchase the rights to a patent and wait for

---

[167] *See* HOWARD J. SHERMAN ET AL., ECONOMICS: AN INTRODUCTION TO TRADITIONAL AND PROGRESSIVE VIEWS 610 (2008).

[168] *See* Masnick, *supra* note 131.   The United Kingdom firm ACS:Law recently caught the attention of the Solicitors' Disciplinary Tribunal, the body responsible for investigating instances of lawyer misconduct in the United Kingdom, for its misuse of settlement letters. Catherine Baksi, *Two Solicitors Accused Over File-Sharing 'Bully Tactics'*, L. SOC'Y GAZETTE (Mar. 11, 2010), http://www.lawgazette.co.uk/news/two-solicitors-accused-over-file-sharing-bully-tactics; SOLICITORS DISCIPLINARY TRIBUNAL, OUR CONSTITUTION AND PROCEDURES, http://www.solicitorstribunal.org.uk/constitution.html (last visited Nov. 19, 2010).   *See also* Mike Masnick, *Davenport Lyons Lawyers Referred to Disciplinary Tribunal Over 'Pay Up or We'll Sue' Copyright Threat Letters*, TECHDIRT (Mar. 16, 2010, 3:51 PM), http://www. techdirt.com/articles/20100315/1119348568.shtml.   ACS:Law was using "bully tactics" as well as sending letters to wholly innocent individuals.   Baksi, *supra*.

[169] *E.g.*, Pinchdice, *The Butt-Hurt Locker or Making Your Movie Profitable Through Litigation*, A SUCCESSFUL WEBSITE (June 6, 2010), http://www.asuccessfulwebsite.com/2010/06/butthurt_locker/.

[170] Warren E. Burger, *The Decline of Professionalism*, 137 PROC. OF THE AM. PHIL. SOC'Y 481, 484-87 (1993) ("Yet if the idea of a profession means anything, it means that a profession must have standards that are above the minimum commands of the law.").

[171] MODEL RULES OF PROF'L CONDUCT, Preamble ¶ 6 (2010).

[172] A patent troll, also called a non-practicing entity, is "someone who tries to make a lot of money off a patent that they are not practicing and have no intention of practicing and in most cases never practiced." Gregory d'Incelli, *Has eBay Spelled the End of Patent Troll Abuses? Paying the Toll: The Rise (And Fall?) of the Patent Troll*, 17 U. MIAMI BUS. L. REV. 343, 346 (2009).   Patent trolls obtain patents that are often "of suspect validity or cover insignificant

another company to unsuspectingly infringe on the patent.[173]  Patent trolls use the threat of a permanent injunction to force the infringing company to pay high licensing fees.[174]    Prior to *eBay, Inc. v. MercExchange, L.L.C.,*[175] trolls and their victims knew that once infringement was proven, a permanent injunction was automatic.[176] That changed in *eBay,* where the Court rejected the automatic injunction doctrine and instituted a four-factor test that more accurately measures the actual harm to the plaintiff.[177]  Post-*eBay* injunctions also consider whether the parties are in "direct market competition," which eliminates trolls who do not practice their patents.[178]  This furthers the policy of protecting commercially competitive patents, while elim-inating incentives for non-practicing entities to "engage in socially costly holdup[s]."[179]

Because permanent injunctions are not the driving force in copyright troll litigation, a different tool is necessary.[180]  However, a similar reform strategy, which aims to limit recovery by opportunistic copyright holders, might form a workable solution.  In *eBay,* the Court

---

parts of the overall product."  *Id.*

[173] *Id.* at 346–47.

[174] *Id.*

[175] EBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006).

[176] d'Incelli, *supra* note 172, at 352.  Patent troll lawyers defended their approach as a "vindication of the rights of the little guy." *Id.* at 349.

[177] *EBay*, 547 U.S. at 391.  "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Id.*

[178] d'Incelli, *supra* note 172, at 360–61.

[179] *Id.* at 362–63.  From 2001 to 2005 there were 1233 patent lawsuits involving non-practicing entities. *Litigations Over Time*, PATENTFREEDOM, (last visited Feb. 15, 2012), https://www.patentfreedom.com/about-npes/litigations/.  From 2006 to 2010, non-practicing entities were involved in 2586 lawsuits with an average damage award of $6.9 million for a total of $17.8 billion. PRICE WATERHOUSE COOPERS, 2011 PATENT LITIGATION STUDY: PATENT LITIGATION TRENDS AS THE "AMERICA INVENTS ACT" BECOMES LAW 9 (2011), http://www.pwc.com/us/en/forensic-services/publications/assets/2011-patent-litigation-study.pdf; *Litigations Over Time*, *supra*.

[180] Some copyright trolls do ask for a permanent injunction, but it is untenable to argue that copyright holders would litigate solely for this injunction without the possibility of large monetary damages.  *See, e.g.,* Complaint and Demand for Jury Trial at 6, Righthaven LLC v. Silver Matrix LLC, No. 2:10-cv-01281 (D. Nev. July 29, 2010), ECF No. 1; Complaint at 5–6, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. May 24, 2010), ECF No. 1.  An injunction would merely forbid the individual from sharing the plaintiff's works.

replaced automatic injunctions that put the patent troll in a superior bargaining position with an equitable solution that considers the legitimate needs of the patent holder.[181]  To combat copyright trolls, removing statutory damages would equalize the bargaining position between infringers and copyright holders, yet still allow actual damages when infringement has caused significant, calculable harm.

## C.  *Removing the Incentive: Statutory Damages*

Statutory damages are no longer supportable based on their original purpose.  The original purpose of statutory damages was to provide compensation when there was uncertainty in determining actual damages.[182]  Following this policy rational, early courts interpreting the original 1909 Copyright Act[183] refused to award statutory damages when actual damages could be proven.[184]  Because the original policy was that the awards should not be a penalty unless the plaintiff could prove actual damages, courts would either refuse to impose statutory damages or only impose the statutory minimum.[185]

Today, some argue that statutory damages are not only intended to compensate, but also to punish.[186]  Consider the Jammie Thomas-Rasset case.[187]  Thomas-Rasset was sued for infringing the copyrights of 24 songs, but was sharing 1702 songs at the time.[188]  If the damages were calculated at the minimum award of $750[189] for each of the songs

---

[181] *See eBay*, 547 U.S. at 391.

[182] Pamela Samuelson & Tara Wheatland, *Statutory Damages in Copyright Law: A Remedy in Need of Reform*, 51 Wm. & Mary L. Rev. 439, 446 (2009).  While this uncertainty may still exist, "absolute certainty as to the damages sustained is in many cases impossible.  All that the law requires is that such damages be allowed as, in the judgment of fair men, directly and naturally resulted from the injury for which suit is brought."  Hetzel v. Balt. & O. R. Co., 169 U.S. 26, 37 (1898).

[183] 1909 Copyright Act, Pub. L No. 60-349, 35 Stat. 1075, 1081–82 (Mar. 4, 1909; *repealed* Jan. 1, 1978).

[184] Samuelson & Wheatland, *supra* note 182, at 449.  The Supreme Court also took this position in two cases interpreting the 1909 Act.  *Id.* at 449 n.39.

[185] *Id.* at 450.

[186] J. Cam Barker, *Grossly Excessive Penalties in the Battle Against Illegal File-Sharing: The Troubling Effects of Aggregating Minimum Statutory Damages for Copyright Infringement*, 83 Tex. L. Rev. 525, 527 (2004).

[187] *See supra* Part III.C.2.

[188] Samuelson & Wheatland, *supra* note 182, at 456.

[189] 17 U.S.C § 504(c)(1) (2006).  Statutory damages can be reduced in the court's discretion to $200 if the court finds the "infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright."  *Id.* § 504(c)(2).  This may be an untenable

she was sharing, the statutory award would be $1,276,500. If we estimate that actual damages are two dollars per song,[190] the ratio of punitive damages to actual damages would be 375:1. This high ratio cannot be explained by a compensatory theory of statutory damages but, rather, suggests that the damages contain a punitive component.

Supreme Court doctrine limiting punitive damages can provide some insight into the proper penalty. Punitive damages with a greater than single-digit multiplier have been struck down by the Court.[191] Were courts to accept the single-digit multiplier doctrine, Thomas-Rasset's penalty would have been a more palatable $500.[192] While a judge in a bench trial could award damages that are in harmony with this reasoning, plaintiffs have a Seventh Amendment right to having statutory damages determined by a jury.[193] Thomas-Rasset's damages were determined by three juries and the verdicts illustrate that juries do not always view damage awards in the same manner that judges do.[194]

Recognizing that copyright on the Internet is unique, commentators have proposed various solutions.[195] One proposed solution would be reductions in the availability of statutory damages combined with levies for Internet use and an inexpensive method of dispute resolution.[196] Other proposed solutions include statutorily treating

---

position because the fact finder can probably conclude that Thomas had *some* reason to believe the songs were copyrighted.

[190] Greg Sandoval, *Will Consumers Determine iTunes Prices?*, CNET (Apr. 7, 2009), http://news.cnet.com/will-consumers-determine-itunes-prices/. Damages may be greater for sharing the same song, but determining how many times a song is shared could create the same problems of determining damages that gave rise to statutory damages. Derek Bambauer, *Tenenbaum and Statutory Damages*, INFO/LAW BLOG (July 11, 2010), http://blogs.law.harvard.edu/infolaw/2010/07/11/tenenbaum-and-statutory-damages/. In the context of the *Thomas* case, actual damages were about fifty-dollars. *See* Samuelson & Wheatland, *supra* note 182, at 456.

[191] *See* State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 438 (2003) ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

[192] This figure accepts actual damages of about $50 plus punitive damages resulting from multiplying nine times the actual damages.

[193] Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 355 (1998).

[194] *See supra* Part III.C.2.

[195] *See* Mark A. Lemley & R. Anthony Reese, *Reducing Digital Copyright Infringement Without Restricting Innovation*, 56 STAN. L. REV. 1345, 1406–13 (2004); Samuelson & Wheatland, *supra* note 182, at 509; Tehranian, *supra* note 88, at 549–50.

[196] Lemley & Reese, *supra* note 195, at 1406–13. To compensate copyright holders for infringement, a "levy would be automatically collected on the sale of software, services or hardware that are likely to be used in infringement." *Id.* at 1406. Lemley and Reese concede

"ordinary" infringers differently than "egregious" infringers.[197]  Further still, some suggest that statutory damages be removed entirely.[198]

Removal of statutory damages is the best remedy for both compensating copyright holders and protecting individuals from copyright troll suits for several reasons.  First, actual damages are a more accurate measure of the damage caused by infringement than statutory damages.  Second, copyright holders are adequately protected without statutory damages.  Most importantly, without statutory damages, copyright trolls would lose the incentive to litigate as a business model.[199]

Tautologically, actual damages accurately measure the losses sustained by infringement.  The purpose of actual damages are to compensate the plaintiff for provable losses attributable to the defendant's actions.[200]  Provable losses can be measured by the diminution of the work's market value as a result of the plaintiff's infringement.[201]  This reduction in value is notoriously difficult to quantify but is likely related to the retail value of the work had a license been obtained legally.[202]  Taking the highest possible value, this loss can be characterized as one lost sale for a download and one lost

---

[197] many of the flaws in such a system, including the amount of the levy, the possible disruptions to innovation, and that the costs generated by the infringers will be equally carried by those users who do not engage in illegal file sharing.  *Id.* at 1408–09.  Lemley and Reese also encourage the use of inexpensive dispute resolution.  *Id.* at 1410–11.  They argue that such a system would move litigation away from companies that facilitate infringement, like creators of file sharing software, and allow copyright holders to pursue the individual infringers instead.  *Id.* at 1411.  Unfortunately, Lemley and Reese did not take the strategy of mass copyright litigation into account.  Although an alternate forum may reduce the strain of these suits on the courts, statutory remedies still allow the plaintiffs to pressure individuals into a quick settlement.  *See supra* Part III.C.1.

[197] Samuelson & Wheatland, *supra* note 182, at 509.  Samuelson and Wheatland argue that the law should be amended to allow courts to impose lower statutory awards when actual damages to the copyright holder are much lower than the current statutory award.  *Id.*  While this solution do create a system where awards more closely resemble actual damages, because the plaintiff would still have to show some proof of actual damages, the system can be simplified by awarding actual damages.  When necessary, the court still has discretion to award punitive damages.  *See* Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 432 (2001) (explaining the purpose of punitive damages is to punish wrongdoing).

[198] Samuelson & Wheatland, *supra* note 182, at 510.

[199] Without statutory damages, copyright trolls would be unable to automatically threaten awards of $150,000.  *See supra* Part III.C.1.

[200] BLACK'S LAW DICTIONARY 333 (8th abr. ed. 2005).

[201] Andrew W Coleman, *Copyright Damages and the Value of the Infringing Use: Restitutionary Recovery in Copyright Infringement Actions*, 21 AIPLA Q.J. 91, 108 (1993).

[202] Barker, *supra* note 186, at 545–46.

sale for an upload of an illegally shared file.[203]  This calculation has the effect of assigning greater responsibility to more prolific infringers and lesser responsibility to casual infringers.

Copyright holders are able to adequately protect their interests using actual damages.[204]  Actual damages would still give copyright holders an incentive to seek a recovery from infringers who cause significant market damage.  On the other hand, individuals who fall below this threshold would appear to be free to infringe.[205]  For these individuals, deterrence can still be achieved without statutory damages by measuring damages based on the value to the infringer.[206]  Furthermore, even if actual damages are insufficient to deter infringement, the plaintiff can still seek punitive damages within constitutional limits.[207]  Finally, infringers still face the possibility of criminal sanctions.[208]

---

[203] *Id.* at 545–47.  This valuation counts a single transfer, one upload and one download, as two lost sales, rather than one.  *Id.* at 546–47.  Furthermore, illegal downloads have a reduced opportunity cost and over represent lost sales due to excess consumption.  United States v. Dove, No. 2:07-cr-00015, at 10 (W.D. Va. Nov. 7, 2008) ("Customers who download music and movies for free would not necessarily spend money to acquire the same product.");  Charles Arthur, *Are Downloads Really Killing the Music Industry? Or Is It Something Else?*, GUARDIAN (June 9, 2009), http://www.guardian.co.uk/news/ datablog/2009/jun/09/games-dvd-music-downloads-piracy.  While there may be issues with determining the number of times a file has been shared by a user, the rules of evidence are more forgiving than when statutory damages were first implemented.  Samuelson & Wheatland, *supra* note 182, at 511.

[204] Supporters of statutory damages often recite the statement that because actual damages can be difficult to prove statutory damages may be a copyright holder's only remedy.  *E.g.*, Millar v. Taylor 4 Burrows 2303, 2350 (K.B. 1769) ("[The Statute of Anne] was brought in . . . upon the common-law remedy being inadequate, and the proofs difficult, to ascertain the damage really suffered.").  In defamation cases, for example, courts have allowed juries "to presume damages without proof of loss and even to award punitive damages."  Gertz v. Robert Welch, Inc., 418 U.S. 323, 346 (1974).  Furthermore, in the context of music file sharing, courts have recognized that actual damages are rationally related to the cost of obtaining a legal license and that statutory damages can be "wholly disproportionate to the damages suffered by [the copyright holder]."  Capitol Records Inc. v. Thomas, 579 F. Supp. 2d, 1210, 1227 (D. Minn. 2008).

[205] *See* Andrew Berger, *Are File-Sharing Willful Infringers Now a Judicially Protected Class?*, ENT. ARTS & SPORTS L. BLOG (July 17, 2010, 12:05 PM), http://nysbar.com/blogs/ EASL/2010/07/are_filesharing_willful_infrin.html.

[206] Coleman, *supra* note 201, at 116 (arguing that a recovery equal to the value of the work to the infringing user provides enough incentive to purchase a license from the holder).

[207] *See* State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 438 (2003).  There is also significant dispute about whether file sharing causes any actual damage to the entertainment industry.  Felix Oberholzer & Koleman Strumpf, *The Effect of File Sharing on Record Sales: An Empirical Analysis*, 115 J POL. ECON. 1, 4 (2007).  Furthermore, some commentators opine that file sharing creates a net economic benefit to copyright holders.  Michael Geist, *Gov't Commissioned Study Finds P2P Downloaders Buy More Music*, Blog (Nov. 2, 2007),

110        UCLA ENTERTAINMENT LAW REVIEW        [Vol. 19:1

The goal of copyright is not to maximize protection, but rather to encourage innovation.[209]  While actual damages can in fact remove the incentive to recover minimal losses, this result correctly aligns incentives to sue with the purpose of copyright protection.  Moreover, because statutory damages give copyright holders the incentive to litigate over such small losses, removing the incentives would relieve courts from a flood of litigation.[210]  Furthermore, plaintiffs could not use the threat of outlandish statutory damages to force settlement and thereby reduce the possibility of negotiation.[211]

Without statutory damages, copyright trolls would be reduced to seeking only damages that result from the infringement rather than a windfall recovery when actual damages are minimal.  Because the trolls could not legitimately threaten to sue for thousands of dollars per infringement, defendants like Jammie Thomas-Rasset would face penalties that were rationally related to the actual damage they caused.

V. CONCLUSION

In March, 2011, Voltage Pictures, as well as other DGW plaintiffs withdrew their complaints against a total of 10,583 defendants.[212]  Voltage Pictures was able to identify 3970 defendants, with more in the process of being produced by ISPs.[213]  While some commentators were quick to declare victory for the defendants,[214] a dismissal does not

---

http://www.michaelgeist.ca/content/view/2347/125/.

[208]  *See* 17 U.S.C. § 506 (2006); 18 U.S.C. § 2319 (2006).

[209]  Mark A. Lemley, *Property, Intellectual Property, and Free Riding*, 83 TEX. L. REV. 1031, 1031 (2005).  Lemley argues that courts are too preoccupied with protecting the rights of owners of intellectual property where courts should be focused on maintaining proper incentives to create.  *Id.* at 1031–33.

[210]  *See* Anderson, *supra* note 80 (showing that copyright trolls sued 24,000 people in the first nine months of 2010).

[211]  *See supra* Part III.C.1.

[212]  Consolidated Status Report Pursuant to the Court's Direction of 3/1/11, at 4, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. Mar. 11, 2011), ECF No. 89. DGW received complete subpoena productions for approximately 5675 IP addresses and DGW expected another 2049, not including those with motions to quash that were pending at the time.  *Id.* at 2–5.  A month later, Voltage Pictures filed an amended complaint with 24,583 doe defendants and twelve defendants named specifically.  First Amended Complaint for Copyright Infringement at 1, Voltage Pictures, LLC v. Vasquez, No. 1:10-cv-00873 (D.D.C. Apr. 22, 2011), ECF No. 143-1.

[213]  Consolidated Status Report Pursuant to the Court's Direction of 3/1/11, at 4, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. Mar. 11, 2011), ECF No. 89.

[214]  Ernesto, *US Copyright Group Drops Cases Against Alleged Hurt Locker Pirates*, TORRENTFREAK (Mar. 18, 2011), http://torrentfreak.com/us-copyright-group-drops-cases-

mean those identified are forgotten.[215]   Rather, it is more likely that Voltage Pictures will use the information gathered to attempt settlement, and, in the case that an infringer is unwilling to settle, re-file the complaint in the infringer's jurisdiction.[216]

The courts are faced with the dilemma of enforcing a law meant to compensate for loss, while plaintiffs use the law to monetize infringement.   Copyright trolls would continue to use their superior legal position to extract large settlements from casual infringers as long as the law creates fertile ground for mass litigation of copyright troll suits.

Perhaps the best way for the law to adapt to the changing landscape of copyright in the digital age is actually to look to history.  Over a century ago, the United Kingdom addressed the issue created by the first copyright troll, Harry Wall.[217]  The solution is the same today as it was then: eliminating statutory damages.[218]  Viewing Wall's actions as repugnant, Parliament removed automatic statutory penalties from the law.[219]

Even if statutory damages are removed, copyright holders would still be able to protect their interests through recovery for actual losses due to infringement, individuals would still be deterred from file sharing through both civil damages and criminal sanctions and the judicial system would no longer be weighed down by cases that contain 24,595 defendants.   While copyright holders will resist the removal of statutory damages, legislators should remember that "the primary objective of copyright law is not to reward the author, but rather to secure for the public the benefits derived from the authors'

---

against-alleged-hurt-locker-pirates-110118/.

[215] Consolidated Status Report Pursuant to the Court's Direction of 3/1/11, at 4, Voltage Pictures, LLC v. Does 1–5,000, No. 1:10-cv-00873 (D.D.C. Mar. 11, 2011), ECF No. 89 ("Voltage will continue its investigation and attempt to resolve the claims with those IP addresses and then pursue those claims as appropriate under the circumstances.").

[216] *See, e.g.*, Complaint at 1-8, Voltage Pictures LLC v. Joseph Cyganiak, No. 2:11-cv-00068 (M.D. Fl. filed Feb. 17, 2011), ECF No. 1.

[217] Bently, *supra* note 47, at 11.

[218] *Id.*

[219] *Id.*

112          UCLA ENTERTAINMENT LAW REVIEW      [Vol. 19:1

labors."[220]   Copyright law should give the authors the "incentive to create"[221] not to litigate.

---

[220] The House Statement on the Berne Convention Implementation Act of 1988, H.R. Rep. No. 100-609, *available at* http://ipmall.info/hosted_resources/lipa/copyrights/ The%20House%20Statement%20on%20the%20Berne%20Convention%20Implementation.pdf.

[221] *Id.*